May it please the Court, my name is Merritt Chastain and I represent the Appellant Brand Services, L.L.C. This case involves the summary judgment dismissal of Brand's trade secret misappropriation claim under the Louisiana Uniform Trade Secrets Act and its claim for conversion under Louisiana law. Brand seeks to have both of those rulings reversed and issue concerning the trade secrets claim is whether Brand was able to establish a fact issue concerning the element of damages. Irex has not sought and below did not seek a ruling about whether the items at issue, the property and the information constituted a trade secret or that there was sufficient evidence that it actually misappropriated a trade secret. I understand the discovery fight. Are there documents that have been produced in Pennsylvania but under a protective order in Pennsylvania that have not been produced in the Texas case that you believe would in fact show the amount of damages? There have been documents produced that show, yes, Your Honor, what has been produced in the Pennsylvania case are thousands of documents that relate to all manner of items that they should have supplemented their discovery for but elected not to do it and represented to the court that they're not aware of any responsive documents to the items that they failed to object to. My question is really specific. If it bore on something else, I'm not interested. I'm Pennsylvania confidential documents that you're aware of that if produced in Texas or allowed to be used in the Texas case would in fact reap a different result assuming arguendo you have to prove an amount of damages as opposed to a fact that you were damaged. Your Honor, I have not seen documents. So you don't know the answer because you haven't seen the actual documents? Well, I have seen many of the actual documents. I have not seen documents that say that you could determine a sum certain that this is the amount of overhead that we had in preparing invoices before the creation of this application based on Brands Trade Secrets versus after that. But could it? I have not seen that. But is it information from which you could question witnesses would give further information on that? Yes, Your Honor. Absolutely. Because there are many documents that show that before Mr. Stanich used Brands Secrets to develop the process for IREX that there were many complaints by customers saying we may end up having to drop you, your invoicing is horrible, you've transposed just about every number here, so forth and so on, your billing is dilatory and late, and therefore that is what I think is very important that if we were allowed additional discovery, which I think we should have, we did file a motion for continuance and that was denied. But there are documents that we could use to question individuals. There are also documents showing the billing records for various customers and so forth. I will point out in response to your question, Your Honor, though they don't identify what the administrative cost was because I suppose that is not a pass-through cost. Counsel, if we were to agree with you, assuming arguendo, that you should have had a ruling on the discovery issue before there was a ruling on the summary judgment and we were to send it back on that, would we need to reach all the other issues? Yes, some of them or which ones? The only issue that I believe that you would have to reach would be the preemption issue on the conversion claim. And that claim, that ruling I think is inherently infirm. There are courts certainly that go both ways. But what the court below held was that notwithstanding the definition and the wording of the preemption provision in the Louisiana Uniform Trade Secrets Act, which definitely says it is premised on the existence of a trade secret, this act applies not just to trade secret misappropriation but to the improper use of any type of business information. That really flies in the face of the express wording of the statute. There are numerous cases from other districts and circuits basically, not basically, but expressly stating that if the tort claim But you're just saying the preemption question is separate from the damages? That's correct, Your Honor. It needs to be addressed. And you're saying that the answer to this preemption question is that as for the non-trade secrets that you should have a cause of action that's not preempted, is that correct? That's exactly right, Your Honor. Because it's not in conflict with the federal, is that right? That's exactly right because the conversion claim does not conflict with the trade secret claim under the LHTSA. And also, the LHTSA expressly says it only displaces conflicting claims pertaining to civil liability for misappropriation of a trade secret. And so what these other cases from Mississippi, Oklahoma, Michigan, California, the Tenth Circuit, Virginia, as well, if a finding that the information was not a trade secret does not doom the other tort claim, then the Uniform Trade Secrets Act does not preempt that particular claim. And that's a very reasonable reading of that because you just have to read, I mean, it's called the Trade Secrets Act. And it says, you know, in order to make out a claim, you have to have a trade secret. And if you have other claims that are premised on the existence of a trade secret, those are the claims and only the claims that are preempted, provided that they do have conflicting remedies. Okay. I want to go back to the discovery because I want to be sure I'm really clear on this. In your exchange with your opposing counsel when you were arguing about the motion to compel and counsel was saying, wrongly in my view, that he has no duty to supplement because you always have a duty to supplement. But one thing the counsel did say that I'd like to know about is, look, you've never really said you had any kind of problem with our document production. You've taken a bunch of depositions. You've questioned witnesses. You've never said, man, I need these documents so I can do these depositions. So why are you now, this is, I'm being your opposing counsel, why are you now raising all this and isn't this just a bunch of hooey? So can you respond to that? Yes, Your Honor. First of all, I will say that in my view and based on my recollection of all of our discussions, I certainly was anything but dilatory in trying to pursue this. We initially tried to, we sent our discovery for the very first time in August of 2016. On the very 30th day deadline, they send back just a blanket general, a blanket universal objection. Which should have been struck. Which should have been struck, that's correct. We prepared a motion to compel and before filing it, sent that over to the opposing counsel. And that was in October? That was in October. I'm sorry, that was in September after you got the one-pager. That's correct, Your Honor. And based on that he said, I'm going to supplement, I'm going to get some documents to you, I'll get responses to you and so on. October 16th, that's when the supplemental and amended responses came in. Which weren't much better. They were much better, but there were many, many of the document requests that the response was, we'll supplement or we will produce responses documents. But so you knew, let's say by late October, that you're getting a little bit jerked around. Why then did you not file a motion to compel right then? Well Your Honor, I thought that I had a very good working relationship with my opposing counsel. And we had been able to agree on most other things and what my recollection of our conversations was, because I'm not going to say he's a liar or anything, but my recollection of the conversations was that I asked him in November, December and then again in January after a hearing we had at the district court and then again in February during the deposition of one of our chief information officer about these documents. And the response was, I'm so sorry, it's taking so long. My clients are, you know, it's mostly  But there's no documentation of this? There's no documentation. I mean, I had notes, but I didn't submit it as a... I mean, I will tell you, my role as a lawyer always was, my word is my bond, but I need to get the other guy's word in writing. Your Honor, I did, I could have done a better job of documenting those, certainly. You know, that's a definite. But the bottom line is that, you know, even after the discovery deadline, we filed a motion to compel. The district court denied that, but at the same time, basically, this was Magistrate Roby, you know, she looked at IREX and said, you know, it's not cool that after you get a document request you say you're going to look and then you don't even do a search. Because not a single document was produced by IREX in this case. And so the bottom line is that the court at the end said, although, you know, I'm going to deny the motion to compel, you have, there are numerous requests for production that you said you will produce documents, you will supplement. You have an affirmative obligation in your order to supplement. About, after several weeks when we had received no documents, we filed a motion to enforce the court order requiring supplementation. That was denied based on the representation that they were unaware of any documents that were actually responsive to any of the ones that they said we will produce documents. So about this same time, IREX is producing, the same IREX company, is producing documents in a related Pennsylvania case. And I was... And are those documents responsive to some of the requests to which they said we had no documents in Texas? They are, Your Honor. Okay. They are. And that's what has not been ruled on, that motion where you said, hey, whoa, wait a minute,  well, let's report. That particular motion was because we could not submit, I mean, it was subject to a protective order in the Pennsylvania case. So the court said, provide documents in that Pennsylvania case that are, or examples of the documents that are responsive within three days or else it's going to be denied. We couldn't force the Pennsylvania District Court to speed up its process necessarily. So the day after the court denied that particular motion, the Pennsylvania court granted the motion to use the documents subject to the protective order for purposes of illustrating to the court what IREX does actually have in its possession but hadn't been produced. So that's the reconsider? That's the motion to... And that hasn't been ruled on? Motion to reconsider the renewed motion. Because now you have some exemplary documents. We do. I'm just trying, I'm not, look, I'm just trying to get to a bottom line here. Sure. I don't want to vote in favor of remanding for discovery ruling that's already been made or that makes no difference. And we've been talking for the last 13 minutes and I'm still a little bit struggling to be clear that there is something relevant here. If there's not, then the discovery issue is irrelevant and we move on to the, you know, particular damages issue. Well, Your Honor, I do believe that there, you know, of the documents that we submitted in camera to the district court, that there are documents that are relevant to the summary judgment proceeding that would better assist in establishing a more certain measure of damages. Okay. Frankly... That was my original question to you and you said no. But now you're saying yes, these documents would support a more, greater certainty in the amount of damages. Yes, Your Honor. Okay. But, you know, even without that, I mean, I think that, you know, it's our position that we met our burden of establishing a fact issue, of showing our damages as a matter of just and reasonable inference. What is the methodology of the damages for the trade secret and the raw logics that go through all the ways that you can prove damages? Right, right. What is the methodology? There's a wide variety. Can be lost profits, can be what a reasonable royalty would be, loss of the value of the trade secret. What we focused on in our summary judgment response was the unjust enrichment that accrued to IREX from the misappropriation of the trade secret. And there is, you know, there is indisputable and uncontested documentary evidence saying that through the use of this new program, that IREX could save two to three days of end invoices every month for every project that it had. Now, let me ask something that's really fundamental here, much more so than what my colleagues have been asking. What are the widgets? What is it that has been taken? I mean, you frequently, when you're trying to get a company running well, you call in, let's say Deloitte or somebody who's, you know, they've now got a cottage industry about we'll come in and we'll fix up all your systems so it'll run like a Swiss watch, okay? So what is it exactly that has been, that you're talking about? What's the substance of it? Are these software programs or what? What it is, is a very sophisticated spreadsheet application that is, it's not just your standard, well, it's an empty spreadsheet. It has a lot of functionality, a lot of macros. It allows somebody who is pricing out a project to identify, you know, we need 15 supports here, we need 50 supports here, we need this, we need that, we need the other. And then to basically build a whole scaffolding system, and these are huge scaffolds for industrial settings, and then once that is done, they can prepare a bid with that through the macros built into the application. They can also track the budget to actual, and then they can also get that component of an invoice prepared with the flick of a switch, essentially, without having to transfer, you know, take this and then say, okay, we had 10 here, and you don't have to duplicate effort. And so it is an Excel spreadsheet, but it's very sophisticated. Brands still uses it today. IREX uses the version that it created from that spreadsheet, and so the savings and the through the use of Brands Trade Secrets is something that the damages just keep racking up, the unjust enrichment damages. Okay. Your time has expired, and I think you've answered Judge King's question of what it is, unless you have something further. Whether it's a trade secret or it's simply confidential information that we've invested a fair amount in to develop, sort of, it almost doesn't make any difference except in terms of the legal framework that you use to analyze it, but it's a thing. That's correct, Your Honor. Yeah. Confidential information, at worst case for you. That's correct. Yeah. Okay. Got it. Thank you. Thank you. You may proceed. Good morning, Your Honors. I'm Matt Williamson, and I'm here on behalf of the defendant and appellee, IREX Corporation. I would at first like very briefly to apologize to the panel and to my opposing counsel for any inconvenience I caused in not appearing before you on Tuesday because of the hurricane. Again, my apologies for any inconvenience. Well, we're here now and ready to listen to your argument. Thank you. Thank you. I would like to start by telling you that, in my humble opinion, that the district court not only made the correct legally and factually based decision, but also made the right and just result in this case. I think it's important that I start out by saying this is a Louisiana case . . . Maybe you're better off sticking to legal and factual because right and just is not what you've done here. Well, I would like to answer, Judge, any questions that you have about that because . . . Well, my question is you've tooled this guy around on discovery for a year saying you were going to produce documents, then you weren't, then you didn't, then you said now it's too late, then you said maybe I can talk IREX into producing stuff, then you produce it in Pennsylvania, then . . . So, no, I don't think right and just is the right analysis, but frankly, it doesn't matter because we've applied a lot of the facts, and if the law supports what the district court did, then whether that's just or not will have to be in the eye of the beholder. Well, Your Honor, I'd like to respond to that if I may because I think what you've essentially taken is opposing counsel's word for it and disregarded mine. No, I read your letter. Because I have . . . I wouldn't start out an argument by making that accusation. I read your letter. I read your response to the discovery request was one paragraph saying I ain't answering nothing, okay? That was your original response. I read it. It's one page, all these discovery requests, I object to all of them, they're all a mess. Then your subsequent discovery response was not much better. Then your letter is what I'm basically quoting. So yeah, I'm not relying on simply your opponent in counsel. I went back and looked at this stuff. Do you have anything to say about . . . Yes. So now if you want to respond, go ahead. . . . about whether you've timely complied with your discovery obligations in this case? Yes, Your Honor. I believe I did. With respect to the very first point about my first reaction to opposing counsel's discovery, it was brief and it was short. The reason for that is that we had, outstanding ourselves, directed discovery to opposing counsel for months that had been unanswered. In fact, we complied with discovery, and it's inaccurate to say that my client didn't comply with discovery, because we voluntarily produced to the other side an entire computer that his expert had for over 18 months. So it's just wrong. It's wrong to say that my client didn't participate in discovery. What about these Pennsylvania documents? I have no idea what they're talking about, because those documents have not been produced to me. I can't answer you. I can tell you this, I can tell you this in as much candor as I can, I do not believe any document exists which would in any way establish even the fact of damage. Are these in the control of your client? You said they haven't been produced to you. Here's the difficulty. I don't know what documents counsel is talking about. They've never been produced to me. Did IREX produce anything in the Pennsylvania case? Millions of documents. Have you looked at any of them? I've looked at some of them, but no, I have not, because I'm not counsel there, I do not have a full appreciation. Okay, so that's what he's talking about. I mean, you're looking at me, this is your client, okay? You have an independent obligation to make sure that you're supplementing and all that. I realize that you have to rely a lot on your client for things. I've been a lawyer, I've represented large companies, I understand the complexities, but if I had a case where they were saying these Pennsylvania documents are what I need, I wouldn't just be going, gee, I don't know what's in Pennsylvania, I'm in Texas. I would be trying to find out. It may be impartial answer to what you're suggesting, Your Honor. I take your point, and I've been obviously very much in touch with Pennsylvania counsel, but I would like to make this point, and that is that the Pennsylvania litigation is massive compared to the Louisiana litigation. It involves many more players, many more allegations, many more companies, many more bases for potential liability than the very confined world that we had down here. So, to the extent that I'm dealing with this case in New Orleans, oh, of course I want to speak with, but I can't duplicate those efforts up there because there's going to be discovery in Pennsylvania which has nothing whatsoever to do here. And it's just, it's massive. I couldn't be doing that. Now, did I speak with my corresponding counsel and client about whether there are documents that are responsive to these requests that have been produced there? Yes, of course. And that's why I was able to represent to the district judge and to Judge Roby that I've not been made aware of the existence of documents to which I should supplement. Okay, let me ask you this then. Once the Pennsylvania court said, here's some exemplars, take them to the district judge in Texas or the magistrate judge in Texas, why should we not allow that process to be completed? Because as far as I can tell, it really wasn't. The summary judgment was just granted without having made that evaluation. I think the answer to that, I think the answer to that is twofold. And that is that both magistrate Judge Roby and district judge Malazzo ruled on the discovery issue. And they determined that all of this plethora of efforts to try and get renewed discovery, came way too late. We're talking months after the fact. I'm sorry, what's your second reason? The second reason is that there was no showing that any of the documents that are produced or talked about would in any way come even close to establishing the existence of damage. Was it ruled on though? The reconsideration was not ruled on, is that correct? It was not, but a previous motion asking for the exact same relief was. But they didn't have any documents as go-bys at the previous one, right? And at this point in time, we're talking about discovery that it was supposed to be over on February 17th. Yeah, but there's a slight difference here, which is, you know, you keep saying you should take your word for it, and I'm sure you're going to continue to say that your opposing counsel should take your word for it. And your word is, hey, I produced everything, okay? But then a counsel opposite believes he finds out that in Pennsylvania, a bunch of stuff's been produced that should have been produced in Texas. That's his first opportunity to say, well, wait a minute, I was believing my opposing counsel, I was trying to be, you know, a collegial sort of lawyer, but now I have reason to doubt, and now I want to bring that. And that is timely. As soon as you discover that, hey, this guy either intentionally or unintentionally is misstating things to me, now he files that motion. And that motion is not untimely, because it was filed as soon as he became aware of the Pennsylvania documents. Now, it may be unhelpful, because the Pennsylvania documents may not matter, but we don't yet know, because the Texas judge hasn't looked at the Pennsylvania exemplars. Your Honor, the Pennsylvania litigation has been pending almost as long as our litigation, and the documents, whatever documents are talked about, were produced months and months before our case was terminated. These documents aren't new, as far as I can tell. It's not like, in fact, counsel's nowhere represented, because I have no information of this effect. These documents were not produced at some time after our discovery cut off and our case was completed. For all we know, and I don't know, I'll be the first to admit to that, but for all we know, these so-called critical, important documents were produced months and months before. In other words... But if he didn't know about them, it would be your duty to know about them and to know whether they're responsive. But Your Honor, that's... Not his. That's the point. But please recall, we showed up at three depositions of my client's witnesses. Three depositions where counsel brought box loads full of documents. Now, some of those documents, I think, came from the computer that were presented in our case. Others of those documents were documents that were produced in the Pennsylvania litigation, I think. Okay. But do you have any basis for that statement you just made? That there were documents produced in Pennsylvania? Because I thought those were under protective order. Is there any basis whatsoever for that statement you just made? Other than the fact that they were IREX documents about which I don't know where they could have come from other than that litigation. Okay. Can we... I think we've really talked about the discovery obligations, and we've got three or four other issues, and maybe we'll have some more questions on that. But can you agree that the theory of unjust enrichment is a viable damages theory, right? I do. Under Wellogix and other cases, that's a viable theory, and that two to three days a month, their expert says, are saved by the use of this improperly obtained spreadsheet application. You agree with that that's their position, right? Your Honor, I'd like to... First of all, I'd just point out that Wellogix is a Texas case that was decided before Texas adopted the Uniform Trade Secrets Act. So I think Wellogix, while I agree with unjust enrichment, I don't disagree, I just want to make a point... It informs our... Well, it informs our trade secrets discussion, and we have used it on other occasions as well in the Fifth Circuit. And I do think... Not just in Texas, but to just... Go ahead. I'm sorry. No, I'm sorry, Your Honor. I'm sorry. I'm not taking issue with it. I'm just simply pointing it out, that with respect to the categories of recoverable damages, Wellogix has category that's not covered by... But this is not one of them. Fair enough. Okay, so... With that said, the other comment I have to make is, is that this is another very important point. There is no expert report that's presented by my opposing counsel, in this case, that says anything about any unjust enrichment to IREX or anybody else. Okay, but who has the person that says it two to three days? I frankly think this is a manufacture of an argument out of whole cloth. I actually have the copies of the deposition transcripts that counsel relies upon to make this argument. Did your client say that it saves him two to three days a month to use this software? And then that would be a way you could calculate this? Yes. Actually, Your Honor, Mr. Chastain says that my client admits that, but there's nothing in the record where he does do that. And in fact, one of the witnesses that Mr. Chastain says, when you look at the deposition transcript, it actually says, you know, I don't think it was two to three days. That's what the witness said. Now, I think it's also important that what Judge Malazzo did was really follow the law and gave Brand every benefit of the doubt. And Judge Malazzo viewed it as if there was some admission of saving two to three days a month by some Brand trade secret. Well, that's a way to measure damages there. But number one, that's very much a view of the facts, but number two is Judge Malazzo... Which is allowed to do it, summary judgment. As Judge Malazzo pointed out, but what amount does that save? There's no amount that we could tie that to. Well, then we just need to know what their monthly take is, and then you can take away that that increases that by, you know, you divide it out by 30 days. It's not a perfect thing, but these kind of trade secrets are notoriously difficult, as our court has written about extensively, and the commentators, to value when you've been damaged. So you could take the 30 days a month, or 31, I'm not quibbling, or how many work days, and then divide that. If you save this amount of money, and so you're able to get this amount, you could just use a calculator and figure out the amount of damages over a period of time that you think this has a useful life, and then that would be the answer. Your Honor, in response to that, I don't disagree, but I think fundamentally where there's a misstep is why there's no evidence of any value that comes about from these two to three days, is that it's speculative at best that there was any savings of two to three days. But if your client said it, then they can use that. But it was said in the context of a question where it was actually more denied than said. In other words, the question was, isn't it true, and the witness was, well, I don't remember anything like that. Okay. So I would just urge, I mean, we pointed out in the pages and the record that ostensibly support this position, they're just not there. Okay. Can we move on, then, to the other legal claim? The why isn't conversion a viable claim? I think it's important that we break this analysis down in two levels. First, to consider whether it's a... Brand has made the suggestion in its brief here that it is seeking to assert a claim for conversion of information that would amount to a trade secret under the definition of the LUTSA, Louisiana Trade Secrets Act. But it's also claiming that it's making a conversion claim for information that doesn't meet that standard. Confidential information. Yeah, what it calls proprietary information, which is question-begging at best. Well, assuming, arguendo, that this record actually contains confidential information that does not rise to the level of trade secrets, do you concede that under the applicable law, you can bring a claim like that in Louisiana? We do not concede that in any way, Your Honor. We contest it vigorously. Explain why not. And I think the best way to put it is a California appeal decision which adopts the majority view of the LUTSA cases and which Judge Malazzo said Louisiana would follow. And quoting a Pennsylvania case that does a majority, the California Supreme Court says, Information cannot be stolen unless it constitutes property. And information is not property unless some law makes it so. The plaintiff identifies no property right outside of trade secret law, then he has no remedy outside that law, and there is nothing unsound or unjust about holding other theories superseded. So what you're saying is you can invest, you can hire Deloitte and get them to confect a system, a software application that will manage all the procedures and so on in your business plan, and that is not a thing that can be converted. Why not? If it doesn't meet the definition of trade secret, then it's... What if it's not a trade secret? What if it's just simply we paid Deloitte, they went up and they, because they're all now in this cottage industry, we went out and they developed this terrific system for us on how we run our paperwork, how we run our procedures, and this guy proceeds to take the whole software package and go out and give it to our competitor, and now they've got it and it saves them all this time. What's the difference between stealing our software package and stealing our furniture or our equipment or whatever? I mean, it's still a thing. If the software package, under your definition, doesn't meet the definition of a trade secret, meaning... Yeah, but what if it isn't a trade secret? I just wanted to make the point that one of the reasons why it wouldn't be a trade secret is that no steps were taken to keep it secret. That's one of the... And this court has recognized that failure to take those steps means that you don't have a property right in it. Okay, so the whole case hinges on whether there's a property right in this package rather than in the equipment, in the building, or whatever. If it's just a software package, an application, a software application, it's not a thing, whereas if it were a piece of equipment in the building, it would be a thing. I think that's correct. Well, that answer begs the issue of the existence of non-trade secret confidential information. It says, oh, there can be no such thing, there is no such animal as confidential information that is not trade secret information. And that's not true. There are numerous cases where we deal with both trade secrets and confidential information. So your answer to the question makes it, says, well, we're going to put it in the trade secret basket, and so there's a null set over here in this answer to the question that I asked you earlier. So I want you to answer, assuming arguendo, that there is some sort of non-trade secret confidential information in this case. Assume arguendo. I know you say there's not. But assuming arguendo, does Louisiana law, does LTSA preempt non-trade secret confidential information? I think it does. Even though two Louisiana intermediate court cases say it doesn't? I'm not aware of those decisions that say that, Your Honor. Okay, are you aware of a case that says it does? That California example is not an example of that, because that had to do with whether it was, in fact, because you put it in the trade secret basket. So do you have a case that says, from any jurisdiction, that says if it's confidential information, not trade secret, that LTSA would preempt? Yes. In fact, it's the Georgia case. I think that was cited by Judge Malazzo. Okay, the Georgia case. And I think that's the majority approach. I had a quick question back to the topic of the three days and whether there's any proof of it. So I pulled up the record sites from the Blue Brief, and there's a Stanich email that says it will save billing about three days a month of processing the manual invoices they are doing now. Why isn't that some evidence of the three days? Because what Stanich is specifically talking about is doing Microsoft Excel programming. Okay, and he's saying that's what they basically provided at a high level. Actually, that's where I think the disconnect is, Your Honor, because what he's talking about is this Schedule D. Okay, but that's merits. It seems to me that's getting into the merits, not whether there's damage. If they're saved three days, then that's unjust enrichment. If they stole it, if they didn't steal anything from you guys, well, then, or you didn't steal anything from them, then, well, yeah, of course, you win anyway. That's a merits question. But that's not what summary judgment was granted on. It was granted on you got nothing. You may have stolen something, but you stole air. And I'm saying this email seems to rebut that. And I think Judge Malazzo did to her credit. She assumed that there was that two to three days. Okay. And for purposes of that. But it's not just an unmoored assumption. It's based on evidence that I'm looking at in the record. And Judge Malazzo assumed that in granting the motion of summary judgment. Okay, I think we have your argument. Thank you. Thank you. Do you have anything on rebuttal, counsel? Yes, Your Honor, I do, just briefly. I think that what we need to keep in mind is that this trade secret, both claims, but especially the more fact-intensive trade secret claim, was dismissed in a summary judgment context. As far as damages are concerned, unjust enrichment certainly is a viable method of calculating damages or an element of damages under the Louisiana Uniform Trade Secret Act. The act is called the Uniform Trade Secret Act. It's not the Uniform Business Information Act. It's very clear. Courts go both ways. We're not in California. We're not in Pennsylvania. Two lower Louisiana courts have held that conversion and other torts that don't conflict and aren't based on a trade secret aren't preempted. Going back to damages, I'm sorry, I slipped right into the conversion argument, but as you pointed out, Judge Haynes, there are several e-mails, one from Mr. Stanich, one from Leslie Johnson, and then Burt Rowe gets involved who worked for IREX but was assigned by IREX to be the president of one of its subsidiaries, Vertical Access Solutions, that creation of this program would save two to three days of administrative overhead per month. So let me ask you this. If we assume arguendo that we agree that you've shown some degree of damage, i.e. the unjust enrichment of the three days, how are we ever going to get to a number that the jury can reasonably assess for those three days? Because that's, I think, the rub here on that question. What you pay an administrative person for a full day's worth of work, I mean, basically what I think the judge had the issue with is that, you know, we do not know exactly how many hours a day IREX's administrative employees work on invoicing, number one. We don't know what they're paid, but you've got to assume they're at least paid minimum wage, $7.25 an hour. And, you know, if they're saying that they save two to three days per project, you take the two to three days of work. Times eight times $7.25. Times eight times the number of projects, and there you go. And that's, you know, and that number's going to change some because, you know, you may have five projects one month, maybe four projects the next. But if we say three days a month, three times eight hours a day times $7.25, that is a number. It may be lower than the real number, but it's a number. That would be your point. That's correct, Your Honor. I mean, for purposes of summary judgment, I think we have at least shown the extent of our damages as a matter of just and reasonable inference,  And in the Wellogic's case, in the Rheingold v. Swiftship's case, this court has said, you know, that's the case, and it allows you to survive summary judgment, even if the actual amount of damages are basically difficult to determine at the time. And, you know, I did point that out to the district court judge, that certainly once we hit trial, we're going to have to ask questions about, I mean, if we're not afforded the discovery that we've asked for and that we think we have a right to, then when we're at trial, we're going to have to ask these people, what do you pay? Do you pay them by the hour? Do you put them on salary improperly under the Fair Labor Standards Act? But, you know, how do you pay your clerical employees or the people that are doing the administrative work on your invoicing? And how many hours do they work a day? I mean, if they're trying to get invoices out fast, maybe they work 10 hours a day. We don't know that exact information, but it should matter for purposes of summary judgment. You can see that there are damages. Because there's at least a minimum number that you feel you've demonstrated. That's correct, Your Honor. Okay. And you think you could demonstrate more at trial, but right now you've demonstrated a minimum. That's correct. Counsel, opposing counsel told us a few minutes ago that you actually had these Pennsylvania documents with you in a deposition during the regular discovery period. Is that true? That's incorrect. Incorrect. All the documents that I used during the depositions were either what we pulled off of Mr. Stanich's computer, and there are innumerable documents that were pulled off of that computer. 1,600 brand files were downloaded onto the IREX computer. About a terabyte of information. And so, I mean, when you're talking documents, that's quite a bit. Okay. I think you've answered our questions. Thank you. This case is submitted.